UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL J. OFFIELD,

             Plaintiff,

    v.

ERIC HOLDER,

             Defendant.

Case No.  12-cv-03053-JST

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: ECF No. 52

## I.    INTRODUCTION

In this Age Discrimination in Employment Act ("ADEA") action brought by Plaintiff Daniel J. Offield ("Plaintiff"), Defendant Eric Holder, in his capacity as Attorney General of the United States ("Defendant") has moved for summary judgment, or in the alternative for partial summary judgment.  ECF No. 52.  The matter came for hearing on March 20, 2014.

## II.    BACKGROUND

### A.    Factual Background[1]

Plaintiff was born in 1961.  Exh. R to Declaration of Jennifer Wang ("Wang Decl."), ECF No. 63.  He was a Special Agent ("S/A") and Special Agent Pilot for the United States Drug Enforcement Agency's ("DEA") San Francisco Field Division ("SFFD") from 1984 to 2010.  Declaration of Daniel Offield ("Offield Decl.") ¶ 3, ECF No. 68.  DEA personnel records indicate that Plaintiff's assigned duty station throughout the relevant time period was the SFFD's San Francisco Division Office at 450 Golden Gate Avenue.  Exh. R to Wang. Decl., at DEA3467, 3422, 3421, 3416 (ECF No. 63).  Plaintiff has testified that while he was initially assigned to work

---

[1] Since this a motion for summary judgment, the facts cited below reflect primarily Plaintiff's evidence, with all reasonable inferences resolved in Plaintiff's favor, and without Plaintiff's evidence being weighed against Defendant's evidence.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  in the San Francisco office, during his time as a pilot, before 2006 he did not generally report to

2  work in any field office and when he was not flying he would work out of an office in the hangar

3  unless he was needed in a field office.  Plaintiff's Deposition ("Pl. Depo.") 39:23-40:10, 47:5-13,

4  48:5-7, 50:18-51:20, 58:5-24, 60:20-23 (ECF No. 60-1, at ECF Page Nos. 11-15, 20-22).

5       During 2003-04, Plaintiff became aware that the DEA planned to relocate aircraft,

6  including those he flew, to a facility in Stockton, California, and the DEA did so in 2005.  Offield

7  Decl. ¶¶ 16, 21; Declaration of Brooks Petersen ¶ 5, ECF No. 58.  Plaintiff moved his residence to

8  Morada, a suburb of Stockton, in April 2005.   Offield Decl. ¶¶ 16, 23, 25.  Plaintiff reports that he

9  generally worked out of the Stockton airport area after that time.  Offield Decl. ¶¶ 27, 29.

10      Plaintiff's immediate superior during much of the relevant time period was Resident Agent

11  in Charge ("RAC") Shawn Speicht.  Speicht, in turn, reported to Assistant Special Agent in

12  Charge ("ASAC") William Inselmann, head of the SFFD's Western Division.  During the relevant

13  period, Inselmann reported to SAC William Brown, and later to Acting SAC William Dionne.

14      Plaintiff testified that, in Spring 2005, SAC Inselmann came to the Stockton hangar with

15  RAC Speight, and that ASAC Inselmann said "[y]ou know, I'm not going to allow you senior

16  guys to retire in place."  Pl. Depo. 101:22-24, 111:8-15 (ECF No. 69, at ECF Page Nos. 95 & 98).

17          **1.      2006 Actions**

18      On or about February 15, 2006, ASAC Speight advised Plaintiff that, pursuant to SAC

19  Inselmann's instructions, Plaintiff was to report each day to the Oakland office each day by 8:30

20  a.m. to assist with non-aviation enforcement activities, and to drive back to Stockton if he needed

21  to fly a mission.  Offield Decl. ¶ 30; Exh. 21 to Pl. Depo. (ECF No. 60-2 at ECF Page No. 50).  If

22  the mission was completed prior to the close of business, Plaintiff was to drive back to Oakland

23  again to report back to the Oakland office.  Id.[2]  Plaintiff's home is approximately 75 miles from

24  Oakland.

25      On March 1, 2006, Plaintiff wrote a letter to SAC Brown to object to the Reporting

26  Requirement.   Exh. 21 to Pl. Depo. ("March 1 Letter"), ECF No. 60-2, at ECF Page Nos. 50-58.

27  _____

28  [2] The Court refers to these requirements as the "Reporting Requirement" hereinafter.

2

1   Plaintiff initially complied with the Reporting Requirement, but was placed on stress leave on

2   March 3, 2006.  Offield Decl. ¶¶ 31-32.  During Plaintiff's stress leave, RAC Speight informed

3   Plaintiff that he was required to box up his gear and equipment from the Stockton hangar and

4   return his laptop computer.  Offield Decl. ¶ 32.  As set forth more fully *infra* at III-A, Plaintiff

5   contacted an EEO counselor around March 11, 2006.

6          In March 2006, the DEA aircraft Plaintiff flew was relocated from Stockton to Oakland.

7   Brown Decl. ¶¶ 5-6.  After returning from stress leave in April 2006, Plaintiff was not assigned to

8   fly again until December 2006, and was denied a government vehicle to commute to work.

9   Offield Decl. ¶ 35.  Plaintiff met with ASAC Inselmann on December 18, 2006, at which time

10  Inselmann provided a memorandum documenting Plaintiff's work requirements, including the

11  Reporting Requirement.  Offield Decl. ¶ 35; Exh. 2 to Pl. Depo. (ECF No. 60-2, at ECF No. 2).

12              **2.        2009 Actions**

13         In mid-2007, Plaintiff again began flying out of the Stockton hangar.  Speight Depo.

14  131:3-11 (ECF No. 69, at ECF Page Nos. 148:3-11); Offield Depo. 130:4-131:19 (ECF No. 69, at

15  ECF Page Nos. 100:4-101:19).  This occurred after Speight told him: "Let's just move [the plane]

16  over to Stockton. Let's pull the manhole cover over our heads, right, and let's just hope that in six

17  months [Inselmann]'s gone and we don't have to worry about it anymore."  Offield Depo. 131:2-7

18  (ECF No. 69, at ECF Page Nos. 101:2-7); Speicht Depo. 283:16-24 (ECF No. 69, at ECF Page

19  No. 151).  Plaintiff believes that, after mid-2007, it was well known in the Western Aviation

20  Resident Office ("WARO") that he was operating out of Stockton, because SFFD personnel either

21  spoke to him about it or themselves flew aircraft out of Stockton.  Offield Depo. 131:24-132:25

22  (ECF No. 69, at ECF Page Nos. 101-02).  He also maintains that his flight records documented the

23  fact that he was operating out of Stockton.  Id.

24         Plaintiff, who had previously been granted a deferral of a temporary duty assignment

25  ("TDY") in Afghanistan, requested a second deferral of the assignment on April 20, 2009.  Offield

26  Depo. 179:1-180:21 (ECF No. 69, at ECF Page Nos. 109-110), and Exh. 6 thereto (ECF No. 60-2,

27  at ECF Page Nos. 8-9).  Plaintiff noted, as he had in his previous request for a deferral, that

28

United States District Court
Northern District of California

1    overseas deployment would impact his ability to care for his adopted children, who had significant

2    psychological needs.  Exh. 6 to Offield Depo. (ECF No. 60-2, at ECF Page Nos. 8-9).

3        On April 24, 2009, Inselmann called Offield to tell him that he was required to go to

4    Afghanistan as a condition of his position within the Air Wing, and that if he was not willing to do

5    so he should "consider going back to the street . . . in the asset forfeiture group in a 9:00 to 5:00

6    job."  Offield Depo. 140:18-141:4 (ECF No. 69, at ECF Page Nos. 103-104).  Inselmann

7    maintains that in the conversation Plaintiff "said that . . . he would rather go back to the street than

8    go to Afghanistan or go TDY," and that it was Inselmann's understanding that Plaintiff would

9    leave the Air Wing if another position were available: "[a]t his discretion -- at his request, I

10   thought he wanted to leave the Air Wing, yes."  Inselmann Depo. 197:10-11, 198:7-9, ECF No.

11   60-7, at ECF Page Nos. 27-28.  Plaintiff disputes this account of the conversation.  Offield Depo.

12   140:9-141:10 (ECF No. 69, at ECF Page Nos. 104-05).

13       On April 28, 2009, Speight ordered Offield to write a memorandum requesting a transfer

14   to the street.  Offield Depo. 221:1-222:9 (ECF No. 69, at ECF Page Nos. 112-113).  Offield sent

15   Speight and Inselmann an e-mail at the end of that day, stating that he was not willing to write or

16   sign such a memo.   Id. 221:1-223:25 (ECF No. 69, at ECF Page Nos. 112-114).  Plaintiff sent

17   another e-mail on the morning of April 29, 2009, confirming that "at no time have I ever requested

18   a transfer back to the street," reiterating his request to be relieved of his TDY assignment to

19   Afghanistan, and stating that he believed he was being subjected to age discrimination. Offield

20   Depo. 256:9-257:12 (ECF No. 69, 118:9-119:12), & Exh. 9 thereto (ECF No. 60-2, at ECF Page

21   Nos. 11-13).

22       On about April 30, 2009, ASAC Inselmann learned that Offield was operating out of

23   Stockton and not Oakland.  Inselmann Depo. 313:7-17 and Exh. E thereto (ECF No. 60-7, at ECF

24   Page No. 42).  On May 4, 2009, ASAC Speight issued Plaintiff a memo, carbon-copied to SAC

25   Inselmann, entitled "Work Expectations" (the "May 2009 Work Expectations Memo"), which

26   stated that Speicht was memorializing a telephone conversation between Plaintiff and Speicht.

27   Speight Depo. 255:3-256:4 (ECF No. 60-10 at ECF Page Nos. 42-43), and Exh. CC thereto (ECF

28

United States District Court
Northern District of California

No. 77-2, at ECF Page Nos. 9-10).  In addition to stating that Offield must "report to the Oakland District Office every working day at 8:30am and you are to call at that time from that office," Speicht wrote in the memo that Offield was "to call me every work day at 5:00 pm or at the conclusion of the work day from that office." Exh. CC to Speicht Depo. (ECF No. 77-2, at ECF Page Nos. 9-10).  The memo also stated that Plaintiff was "directed to deploy TDY to Afghanistan from July 15 - September 15." Id.

On May 5, Offield received a memo from ASAC William Dionne, dated May 1, entitled "Denial of Request for Removal from Extended Temporary Duty Assignment."  Offield Depo. 307:14-308:9 (ECF No. 69, at ECF Page Nos. 125-26) & Exh. 11 thereto (ECF No. 60-2, at ECF Page Nos. 20-21).  Offield called Inselmann to tell him that he did not agree with the memo and would not sign it.  Offield Depo. 308:11-20.  Inselmann told Plaintiff he had to sign the memo.  Id. 308:21.  Plaintiff discussed the matter with ASAC Gabrielle Zucco, who had delivered the memo to him, and she recommended that Plaintiff date and sign the memo and write 'do not concur' underneath his signature.  Id. 308:23-24.  Plaintiff apparently wrote "I do not concur" on the memo, and signed the line labeled "received by" on May 5.  Exh. 11 to Offield Depo.

On June 4, 2009, Inselmann informed Dionne that Offield had relocated the plane without his permission, failed to report to the Oakland office, and refused to perform a TDY in Afghanistan.  Dionne Depo. 81:5-22 (ECF No. 60-5, at ECF Page No. 5) & Exh. Y thereto (ECF No. 60-5, at ECF Page Nos. 16-18).  Dionne informed DEA Chief of Operations Thomas Harrigan of this, and on June 17, 2009, Dionne submitted a written request to have Offield transferred. Dionne Depo. 85:13-86:20, 96:3-23 (ECF No. 60-5, at ECF Page Nos. 7-9), & Exh. Y thereto (ECF No. 60-4, at ECF Page Nos. 16-18); Harrigan Decl. ¶¶ 8-9 (ECF No. 54).  Harrigan approved Dionne's request, and on July 2, 2009 ordered that Offield be reassigned.  Harrigan Decl. ¶¶ 9-10.

On July 3, 2009, Offield was informed by RAC Scott Pascoe that he was being removed from the DEA Aviation Division and was being transferred to Oakland as a street agent.  Offield Depo. 333:10-20 (ECF No. 69 at ECF Page No. 127).  He was replaced by Andy Crody, a 32-

1    year-old pilot.  Offield Depo. 259:9-22 (ECF No. 69, at ECF Page No. 120); Offield Decl. ¶ 47.

2    As of July 3, 2009, Offield had 75 more days before he would have been eligible to retire on

3    September 16, 2009. Offield Decl. ¶ 45, ECF No. 68.

4         In March 2010, plaintiff applied to became the Group Supervisor of the Tactical Diversion

5    Squad at the SFFD's Sacramento District Office.  Declaration of Michele M. Leonhart ¶ 18 (ECF

6    No. 56).  Plaintiff was not selected for the position.  Declaration of Anthony D. Williams ¶¶ 8-12

7    (ECF No. 59).  Plaintiff retired in December 2010.  Offield Decl. ¶ 3.

8         **B.    Procedural History**

9         Plaintiff filed this action in June 2012 against Defendant and Does 1-50, bringing causes of

10   action for age discrimination and retaliation under the Age Discrimination in Employment Act

11   ("ADEA"), 29 U.S.C. § 621, *et seq*., as well as a cause of action for retaliation under the False

12   Claims Act, 31 U.S.C. §3730(h).  Complaint for Age Discrimination in Workplace and Retaliation

13   ("Complaint"), ECF No. 1.  The Court granted in part and denied in part Defendant's Motion to

14   Dismiss in October 2012.  ECF No. 21.  The Court declined to dismiss Plaintiff's first two causes

15   of action, finding that the constructive termination claim was sufficiently "like or reasonably

16   related to the allegations" in Plaintiff's 2009 EEOC complaint.  Id. (quoting Oubichon v. N.

17   American Rockwell Corp., 482 F.2d 569, 571 (9th Cir. 1973)).  By Plaintiff's stipulation, the

18   Court dismissed the Complaint's third cause of action for retaliation under the False Claims Act.

19        **C.    Jurisdiction**

20        Since Plaintiff's claims arise under federal statutes, this Court has jurisdiction pursuant to

21   28 U.S.C. §1331.

22        **D.    Legal Standard**

23        When considering a motion for summary judgment or partial summary judgment, "the

24   court must draw all reasonable inferences in the light most favorable to the non-moving party."

25   Johnson v. Rancho Santiago County Cmty. Coll. Dist., 623 F.3d 1011, 1018 (9th Cir. 2010).

26   However, unsupported conjecture or conclusory statements do not defeat a genuine dispute as to

27   material fact and will not defeat summary judgment.  Surrell v. Cal. Water Serv. Co., 518 F.3d

28

United States District Court
Northern District of California

6

1097, 1103 (9th Cir. 2008).  Partial summary judgment is appropriate for "part of each claim or defense" provided that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ. Pro. 56(a).

A fact is "material" if it might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A "genuine dispute" over any such fact exists only where there is sufficient evidence from which a reasonable jury could find for the non-moving party.  Id. at 248.  In considering a motion for summary judgment, the "court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the moving party for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial.  See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000).  Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  Greer v. Lockheed Martin Corp., 855 F. Supp. 2d 979, 985 (N.D. Cal. 2012). If the moving party satisfies its initial burden of production, then the non-moving party must product admissible evidence to show that a genuine issue of material fact exists.  See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  It is not the duty of the district court "to scour the record in search of genuine issue of triable fact."  Id.  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint."  Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and

1    internal quotation marks omitted).  If the non-moving party fails to make this showing, the

2    moving party is entitled to summary judgment.  See Celotex Corp. v. Caltrett, 477 U.S. 317, 323

3    (1986).

4    **III.    ANALYSIS**

5        Defendant seeks summary judgment on a number of specific issues: (a) that all claims

6    arising out of the 2006 actions are time-barred, (b) that the May 2009 Work Expectations

7    Memorandum cannot constitute an "adverse employment action," (c) that there is insufficient

8    evidence from which a reasonable fact-finder could conclude that the DEA's actions were pretext

9    for age discrimination, (d) that the challenged actions cannot constitute "constructive discharge,"

10   (e) that Plaintiff's claims arising out of a 2010 interview with the DEA's Office of Professional

11   Responsibility are barred, (f) that Plaintiff's claims arising out of his non-selection for the

12   Sacramento promotion are barred, and (g) that certain of Plaintiff's damages claims are barred as a

13   matter of law.

14       **A.    Exhaustion of Claims Arising From 2006 Actions**

15       "A discriminatory practice, though it may extend over time and involve a series of related

16   acts, remains divisible into a set of discrete acts, legal action on the basis of each of which must be

17   brought within the statutory limitations period."  Lyons v. England, 307 F.3d 1092, 1108 (9th Cir.

18   2002); see also Nat'l Passenger Corp. v. Morgan, ("Morgan"), 536 U.S. 101, 113 (2002).

19   Defendant moves for partial summary judgment that Plaintiff cannot challenge the discrete acts

20   that occurred in 2006 (namely, the Reporting Requirement, the requirement that he clear out his

21   office in the Stockton hangar and turn in his laptop, the denial of his official government vehicle

22   request, and his not being returned to flight duty immediately after his stress leave),[3] since he did

23   not file his EEO complaint until 2009.  See Compl. ¶ 9.  In response, Plaintiff does not dispute that

24   he failed to timely exhaust claims arising out of the 2006 action, but he invokes equitable estoppel

25   and waiver as reasons to bar application of the regulatory exhaustion requirement.

26       "Federal employees who believe they have been discriminated against on the basis of age

27

28   _____
     [3] The Court refers to these actions collectively hereinafter as the "2006 Actions."

United States District Court
Northern District of California

United States District Court
Northern District of California

have 'the option of pursuing administrative remedies, either through the agency's EEO

procedures, or through the Merit Systems Protection Board.'" <u>Shelley v. Geren</u>, 666 F.3d 599,

605 (9th Cir. 2012) (<u>quoting</u> <u>Bankston v. White</u>, 345 F.3d 768, 770 (9th Cir. 2003)).  "Equal

Employment Opportunity Commission (EEOC) regulations provide that an aggrieved federal

employee who pursues the EEO avenue must consult an EEO counselor within forty-five days of

the effective date of the contested personnel action, prior to filing a complaint alleging age

discrimination."  <u>Shelley</u>, 666 F.3d at 605 (<u>citing</u> 29 C.F.R. §§ 1614.103, 1614.105(a)(1)).

> The regulations further provide that an employee's failure to initiate contact with an EEO Counselor within 45 days is grounds for the dismissal of her EEO complaint, see id. § 1614.107(a)(2), although "[t]he time limits in this part are subject to waiver, estoppel and equitable tolling." Id. § 1614.604(c). Similarly, although the regulatory pre-filing exhaustion requirement at § 1614.105 "does not carry the full weight of statutory authority" and is not a jurisdictional prerequisite for suit in federal court, we have consistently held that, absent waiver, estoppel, or equitable tolling, "failure to comply with this regulation [is] ... fatal to a federal employee's discrimination claim" in federal court. <u>Lyons v. England</u>, 307 F.3d 1092, 1105 (9th Cir.2002); <u>see also</u> <u>Johnson v. U.S. Treasury Dep't</u>, 27 F.3d 415, 416 (9th Cir.1994) (per curiam); <u>Boyd v. U.S. Postal Serv.</u>, 752 F.2d 410, 414 (9th Cir.1985).

<u>Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch</u>, 572 F.3d 1039, 1043 (9th Cir.

2009).  However, "[a]lthough failure to file an EEOC complaint is not a complete bar to district

court jurisdiction, substantial compliance with the exhaustion requirement is a jurisdictional pre-

requisite."  <u>Leong v. Potter</u>, 347 F.3d 1117, 1122 (9th Cir. 2003) (<u>citing</u> <u>Sommatino v. United

States</u>, 255 F.3d 704, 708 (9th Cir. 2001).

   The Court must first consider whether Plaintiff has demonstrated at least "substantial

compliance" with the exhaustion requirement.  Only after the Court determines that this

jurisdictional prerequisite is satisfied can the Court then proceed to consider whether Plaintiff is

entitled to invoke equitable estoppel or waiver.  Where, as here, the jurisdictional issue is

independent from the merits of the case, "the district court is ordinarily free to hear evidence

regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where

necessary."  <u>Carijano v. Occidental Petroleum Corp.</u>, 686 F.3d 1027 (9th Cir. 2012) (<u>quoting</u>

<u>Augustine v. United States</u>, 704 F.2d 1074, 1077 (9th Cir. 1983)).

In the Complaint, Plaintiff alleges as follows:

> On or about March 11, 2006, Plaintiff contacted a DEA San Francisco Field Division EEO Counselor, and advised her that he wanted to file an EEO complaint based on harassment and discrimination.
>
> [. . .]
>
> On or about March 21, 2006 Plaintiff received a phone call from the DEA SFFD EEO.  She advised Plaintiff that she did not believe Plaintiff had enough evidence to file an EEO complaint at the time and that Plaintiff should return to work and see "how things played out."
>
> [. . .]
>
> On or about April 11, 2006, Plaintiff spoke with the DEA SFFD EEO Counselor.  She advised Plaintiff that she had spoken with her EEO boss at DEA Headquarters, who advised him that Plaintiff did not have sufficient cause to file an EEO complaint. Ms. Judkins further advised Plaintiff that upon returning to work she might be able to mediate with Plaintiffs superior regarding the requirement to drive to the Oakland RO on a daily basis from his residence in Morada, California, an approximate one hundred fifty four (154) mile round trip drive.

Complaint ¶¶ 26, 29, 38.  In his 2013 deposition, Plaintiff testified as follows:

> Q. When was the first time that you had contact with the EEO office at the DEA? So an EEO counselor, for example?
>
> A. Boy, that would have probably gone back to 2006, I think.
>
> Q. Okay. And was it just one occasion in 2006 or multiple occasions in 2006?
>
> A. It was probably several times when I was talking to the EEO counselor over a period of time.
>
> Q. Was it the same counselor each time?
>
> A. Well, there were several counselors, so I think Judy Judkins was the person that I was actually talking to originally, and then I don't know, I know I had spoken to Iris Myers, the other  EEO counselor. She was in Oakland and I don't know how long it was before I actually started mentioning or talking to her about the case.
>
> Q. So in 2006, do you recall if all of the communications that you had with an EEO counselor were with Judy Judkins?
>
> A. Well, I think it progressed eventually from Judy, because I don't think that things were going well under her, and eventually we progressed to somebody else, Natasha Krogstadt, I think was the

1    next EEO person but she was the EEO investigator up in -- in Reno,
     I believe.

2    Q. Okay. My understanding is that that was in 2009?

3    A. Yeah, well --

4    Q. Is that right?

5    A. Right, because I think originally I started talking to the first EEO
6    counselor and basically things just kind of calmed down. I don't
     think we really went anywhere with it, so . . .

7    Q. Okay. So let me -- I want to go sort of in chronological order.

8    A. Okay.

9    Q. So focusing -- it seems like 2006 is the first time that you had any
10   contact with any EEO counselor, correct?

11   A. Correct, uhm-hum.

12   Q. You think that was Judy Judkins?

13   A. I know it was Judy Judkins, I'm just not sure exactly what the
     date is.

14   Q. And do you recall how many occasions in 2006 you had contact
15   with an EEO counselor?

16   A. I don't.

17   Q. Do you recall the last time in 2006, you know, the last month or
     whenever the last occasion was that you spoke to an EEO counselor,
18   again just in 2006 for now?

19   A. I don't. You know, I mean, I recall where I was when I met Judy
20   and I told her everything. I don't recall the date, but in 2006 I was
     back on the street in the Oakland office and Iris was there, so I
     would imagine that I might have had, you know, discussions with
21   her during 2006, but to give you an exact number or what they were
     about, I couldn't do that.

22   Q. Or the last time. My question was about the most recent in 2006 -
23   -

     A. I don't know.
24
     Q. -- the last occasion that you had contact with an EEO counselor.
25
     A. I don't know.
26
     Q. And you didn't file an EEO complaint in 2006?
27
     A. Like where it went up to the chain of command to the EEOC, no.
28

11

Q. Whether or not it went up to the EEOC, did you file an EEO complaint with an EEO counselor?

A. Well, I spoke extensively to the EEO counselor, whatever; I don't know what she did in terms of it. I don't remember actually filling out any paperwork for her, but I don't know what the process is for an EEO counselor was. She filed it, they reviewed it and they said it's not enough, whatever. I don't know.

Q. So you don't recall filling out an EEO complaint of any sort - -

A. No.

Q. --in 2006?

A. Hm-mm.

Q. Is that a no?

A. No, no.

Q. Do you recall if in 2006 you requested to file an EEO complaint, if you asked one of the EEO counselors?

A. I felt that yes, that it was warranted one and I spoke to Judy about it. And I just recall that whatever she did basically ended up being that there wasn't enough in her mind to go forward with it.

Q. But my question was: Did you ask an EEO counselor, whether Judy Judkins or Iris Myers, in 2006 to file an EEO complaint on your behalf?

A. No, because when she told me that there wasn't anything, I figured that was the end of it.

Q. So when was the next time after -- whenever the last communication you had in 2006 with an EEO counselor, when was the next time?

A. I think it was in 2009. I don't know exactly what the date was.

Q. Okay. So between -- so in 2007, 2008 you had no contact with an EEO counselor?

A. I wouldn't say I didn't have any contact because in 2007 and '8 I would have been still in contact periodically with -- with Iris.

Q. During those times did you speak to Iris about bringing an EEO complaint? So my understanding is that Iris Myers is also an investigator, correct? Is it diversion investigator?

A. Right. Diversion Investigator.

Q. I am going to call it DI for short.

United States District Court
Northern District of California

12

1    A. Right. That's it.

2    Q. Okay. So my understanding is that that's Ms. Myers' position at
     the DEA, she's a DI?

3

4    A. At the Oakland office, correct.

5    Q. So I'm not talking about your communications with Ms. Myers in
     her capacity as a DI, so if you worked with her in that capacity.

6    A. Right.

7    Q. So leaving those communications aside. In 2007 or 2008, did you
     have any discussions with Ms. Myers about EEO complaints or, you
8    know, complaints that you felt you were being discriminated
     against?

9

10   A. I think they would have come after I had filed the EEO thing,
     probably afterwards. So no, the answer to your question was I don't
     recall any in 2007 and 2008.

11

Plaintiff's Deposition 351:1-356:7.[4]

12        In response to this Motion for Summary Judgment, Plaintiff filed a new declaration dated

13   February 10, 2014 in which he declares, along the lines of the allegations in his complaint:

14

15        On or about March 11, 2006, I contacted DEA San Francisco Field
          Division EEO Counselor Judy Judkins and advised her that I wanted
16        to file an EEO complaint against ASAC Inselmann, based on
          harassment and discrimination.

17        On or about March 21, 2006, I received a phone call from DEA San
          Francisco Field Division EEO Counselor Ms. Judkins. She advised
18        me that she did not believe I had enough evidence to file an EEO
          complaint at the time and that I should return to work and "see how
19        things played out." Ms. Judkins took no action on my behalf.

20   Declaration of Daniel J. Offield ¶¶ 33-34, ECF No. 68.[5]

21

22   _____

     [4] This transcript is pieced together from three documents: one submitted by Defendant as Exhibit
23   A to the first Declaration of Jennifer Wang (ECF No. 60-1, ECF Page Number 112), another
     submitted by Plaintiff entitled "Plaintiff's Deposition Transcripts," (ECF No. 69, ECF Page
24   Numbers 128-29) and another submitted by Defendant as Exh. U to the Supplemental Declaration
     of Jennifer Wang, ECF No. 75-1 (ECF Page Numbers 9-14). Plaintiff's version says it is from his
25   May 31, 2013 deposition (ECF No. 69 at ECF Page Number 88), while Defendant's versions both
     say it is from Plaintiff's July 16, 2013 deposition (ECF No. 60-1, at ECF Page Number 104, ECF
26   No. 75-1, at ECF Page Number 9), but it is clear that they are transcripts of the same deposition.
     The text of page number 354 is identical.
27   [5] The new declaration makes no mention of the April 2006 phone call alleged at ¶ 38 of the
     Complaint, in which Ms. Judkins allegedly indicated that she had spoken with her superiors.  In
28

United States District Court
Northern District of California

1    Defendant has submitted no evidence probative of whether and when Plaintiff contacted an

2    EEO counselor, nor what any counselor said to Plaintiff.  However, Defendant points out that

3    Plaintiff was represented by his current counsel as early as March 2006.  See Plaintiff's

4    Deposition 427:2-24 and Exh. 2 thereto (ECF No. 60-1 at ECF Page Numbers 122 and 50).

5    Defendant also notes that another EEO counselor at the SFFD considered herself a friend of

6    Plaintiff.  Deposition of Iris Meyers 95:3-20, Exh B. to Declaration of Jennifer Wang (ECF No.

7    60-9 at ECF Page No. 6).

8              **1.      Substantial Compliance**

9    Defendant makes much of the fact that Plaintiff could not recall, in a deposition that took

10   place years later, when he spoke to Judkins.  Reply Br. 3:2-13.  But in a letter by Plaintiff written

11   March 1, 2006, he stated that he was advised of the Reporting Requirement on February 15, 2006.

12   Exh. 21 to Plaintiff's Deposition (ECF No. 60-2 at ECF Page No. 50).  The other challenged

13   actions occurred "during the time . . . [Plaintiff] was placed on stress leave," which began on

14   March 3, 2006.  Offield Decl. ¶ 32.  Plaintiff first contacted Judkins on March 11.  Offield Decl. ¶

15   33.

16   The Court finds that, by a preponderance of the evidence submitted on this motion, it is

17   more likely than not the case that, within 45 days of the 2006 Actions, Plaintiff verbally informed

18   an EEO counselor that he wished to file a complaint, and that that the EEO Counselor responded

19   that she did not think that Plaintiff had sufficient grounds and should instead return to work.  The

20   question is, on these facts, whether Plaintiff has demonstrated sufficient "substantial compliance"

21   to give this Court jurisdiction over claims arising out of the 2006 events.

22   Defendant maintains not, relying primarily on Sommatino.  In that case:

23        Sommatino spoke with her Equal Employment Opportunity
          ("EEO") counselor, Ms. Gerry Wade, about her plight with
24        Hollifield, the hostile environment, discriminatory conduct, and the
          lack of support from her superiors.  Ms. Wade told Sommatino that
25        a formal harassment complaint would be futile due to the difficulty
          in working with the department head, Ms. Linser.  However, Ms.
26        Wade, in a declaration, stated that at no time did she discourage

27   _____

28   his papers, Plaintiff points to no evidence substantiating this allegation.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

> Sommatino from filing an EEO complaint, and that she provided Sommatino with the forms and paper work for filing a complaint. Wade advised Sommatino to submit a memorandum each time she witnessed inappropriate behavior.

3

4

5

> On December 1, 1995, the day after her meeting with Ms. Wade, Sommatino wrote an e-mail to her supervisor, Ms. Sweeney. In the e-mail, Sommatino stated that she had discussed with Ms. Wade the filing of three EEO complaints . . .

6

> [ . . . ]

7

8

> On December 6, 1995, Sommatino again met with Ms. Wade, who advised her to forward her complaints regarding Hollifield and Reed to her supervisors. Sommatino sent an e-mail that day to her supervisors . . .

9

> [ . . .]

10

11

12

13

> In a third e-mail to her supervisors on December 12, 1995, Sommatino complained that she saw Hollifield cup a female supervisor's left elbow in his right hand while saying something about going home. Sommatino's e-mail stated, "Please be advised that this could warrant another third party complaint. Also remember that I have not formally filed any complaint, but I have the basis for a first party complaint and two third party complaints. I will formally file these with Gerry tomorrow if necessary."

14

15

16

17

18

> On December 13, 1995, Sommatino's supervisor, Ms. Sweeney, proposed that Sommatino and another worker move to an available workstation upstairs. That same day, Sommatino e-mailed the EEO counselor and stated that this proposal was unacceptable and could be taken as a retaliatory action regarding her complaints about both Hollifield and Ms. Reed. However, in early 1996 Sommatino and another worker were moved upstairs.

19

255 F.3d at 706. The Ninth Circuit affirmed the district court's judgment that it lacked subject-

20

matter over Sommatino's claims. Id. at 711. The court concluded that Sommatino's "verbal

21

complaints to the EEO counselor and her e-mails are insufficient to constitute substantial

22

compliance with the claim presentment requirements" and that "Sommatino took no actions to

23

engage the administrative process beyond her verbal complaints and e-mails." Id. at 708, 710.

24

Defendant reads this is a blanket holding, suggesting that verbal complaints to EEO counselors

25

*always* fail to meet the test of "substantial compliance," if unaccompanied by formal complaints.

26

But the facts of Sommatino are distinguishable, and its rationale does not directly apply.

27

Two distinctions are salient. First, the Sommatino court noted that "the text of the e-mails

28

belies Sommatino's argument" that she had presented her claims to the EEO counselor. Id. at 710.

15

1    Sommatino specifically said in those e-mails that she had *not* formally filed any complaint.  Id.

2    From her emails, it was clear Sommatino knew that filing a formal complaint was an option she

3    could pursue which was entirely distinct from her verbal outreach to her counselor.  Id.  She

4    nevertheless declined to file any complaint.

5         Second, unlike here, in Sommatino the EEO counselor testified that she did not discourage

6    Sommatino from filing a complaint, and even gave her the forms to do so.  Id. at 706.  Here,

7    Plaintiff Offield understood his communications with Judkins to be attempts to pursue an EEO

8    complaint, and understood Judkins' response to be a rejection of the claim.  There is no evidence

9    in the record suggesting Plaintiff knew filing a formal written complaint was another option, nor is

10   there evidence indicating Judkins provided Plaintiff with the forms or paperwork to file one.

11        The other case prominently cited by Defendant, Davis v. Potter, is likewise

12   distinguishable.   No. 04-cv-0939-SI, 2005 WL 1513161 (N.D. Cal. June 20, 2005).  In Davis, the

13   plaintiff "never complied with any of the[] exhaustion requirements despite his *actual knowledge*

14   *of the required procedures*."  2005 WL 1513161, at *2 (emphasis added).  As in Sommatino, but

15   unlike this case, the EEO counselors to whom Davis spoke sent him the forms to file a formal

16   complaint, and he declined to do so.  Id.  While his counsel did later send a letter "entitled 'Formal

17   EEO Complaint' and stating 'This is a formal EEO Complaint of Discrimination, which I am

18   sending to you prior to filing a federal lawsuit in federal court,'" the court held that "even if the

19   Court considered the January 3, 2004 letter a proper EEO complaint or intent-to-sue notice, it was

20   undisputed that plaintiff did not receive a final agency decision before filing suit."  Id. at *3.

21        Sommatino also emphasized that a complaint meeting the substantial compliance

22   requirement "must at least be sufficient to notify the agency that employment discrimination is

23   claimed."  Id. at 710.  Here, the Court finds that Offield, perhaps unlike Sommatino, cleared this

24   low hurdle by stating that he wished to file an EEO complaint.

25        As the Ninth Circuit has emphasized, under the EEOC's own interpretation of its

26   exhaustion requirement, it is critical whether a complaint "exhibit[ed] an intent to begin the EEO

27   process."  Kraus, 572 F.3d at 1046 (citing Osuagwu v. Peake, EEOC Dec. 0120081307, 2008 WL

28

United States District Court
Northern District of California

2264405, at *1 (E.E.O.C. May 20, 2008)).  Here, Plaintiff's evidence suggests that he did exhibit that intent, and Defendant has submitted no evidence suggesting that Plaintiff did not.

While basic elements of exhaustion go to subject-matter jurisdiction, the Ninth Circuit has also "recognized that strict compliance with the filing period may be excused 'if the plaintiff had neither official notice nor actual knowledge of the filing period.'"  Thornhill v. Marsh, 866 F.2d 1182, 1184 (9th Cir. 1989) (quoting Cooper v. Bell, 628 F.2d 1208, 1212 (9th Cir.1980)).  On Defendant's reading, courts lack jurisdiction even over claims brought by one who lacked knowledge of the EEO formal filing requirement, who attempted to bring a claim through an EEO counselor, and was told by an EEO counselor that the claim had been denied.  This would essentially eliminate a possibility for equitable relief that has been consistently recognized by the Ninth Circuit and is even specifically contemplated by the EEOC regulation itself.  See 29 C.F.R. § 1614.604(c) ("[t]he time limits in this part are subject to waiver, estoppel and equitable tolling").

Plaintiff's communications with Judkins did not satisfy the EEO administrative exhaustion requirements.  But they demonstrate sufficiently "substantial compliance" to allow the Court to exercise its jurisdiction to consider whether equitable estoppel or waiver should permit Plaintiff to pursue claims arising out of the 2006 Actions.

### 2.      Equitable Estoppel

Plaintiff argues that the Court should find Defendant equitably estopped from asserting Plaintiff's noncompliance with the exhaustion requirement as a defense to Plaintiff's claims.

"A finding of equitable estoppel rests on the consideration of a non-exhaustive list of factors, including: (1) the plaintiff's actual and reasonable reliance on the defendant's conduct or representations, (2) evidence of improper purpose on the part of the defendant, or of the defendant's actual or constructive knowledge of the deceptive nature of its conduct, and (3) the extent to which the purposes of the limitations period have been satisfied."  O'Donnell v. Vencor, Inc., 465 F.3d 1063, 1067 amended, 466 F.3d 1104 (9th Cir. 2006) (quoting Santa Maria v. Pac. Bell, 202 F.3d 1170, 1176 (9th Cir. 2000), overruled on other grounds by Socop-Gonzalez v. I.N.S., 272 F.3d 1176, 1194 (9th Cir. 2001)).

United States District Court
Northern District of California

1    There is no evidence in the record suggesting Defendant or the DEA had any improper

2    purpose, nor even that they had actual or constructive knowledge of any deceptive conduct.  The

3    2009 EEO filing came three years after Plaintiff was required to bring an administrative complaint

4    regarding the 2006 Actions, so excusing Plaintiff's failure to file would substantially frustrate the

5    purposes of the limitations period.  In considering the reasonability of Plaintiff's reliance on

6    Judkins' statement, it is important to note that Plaintiff was acting "[o]n advice from" his current

7    attorney at least as of March 1, 2006.  He nonetheless failed to file an administrative complaint or

8    notice to sue in 2006, when they still would have been timely, or at any point during the

9    intervening three years.

10    After considering only the evidence provided by Plaintiff, and after resolving any

11    reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff is not entitled to

12    invoke equitable estoppel.

13    ### 3.    Waiver

14    Plaintiff also argues that Defendant waived its exhaustion argument, since the EEO

15    accepted his 2009 EEO complaint.  The EEOC is empowered to waive the regulatory exhaustion

16    requirements.  But Plaintiff has failed to produce any evidence indicating that the DEA actually

17    did so.

18    Plaintiff argues that Offield's 2009 administrative complaint was "replete with discussion

19    of Offield's claims regarding Inselmann's conduct in 2006."  Opp. 11:25-12:1.  But Plaintiff

20    points to no authority suggesting that a defendant must comb through an administrative filing, and

21    specifically identify and object to any untimely claims, or else risk waiving valid exhaustion

22    arguments.  The Ninth Circuit has rejected the proposition that when an agency "accept[s] the

23    complaint and beg[ins] an investigation, it waive[s] the right to contest timeliness."  Boyd v. U.S.

24    Postal Serv., 752 F.2d 410, 414 (9th Cir. 1985).

25    But even more importantly, while Plaintiff's complaint may have been "replete" with

26    references to 2006 acts, it organizes those references in a section entitled "*Prior* Discriminatory

27    and Disparate Conduct by ASAC Inselmann and RAC Speight Towards Agent Offield."  ECF No.

28

18

United States District Court
Northern District of California

70, at ECF Page No. 23 (emphasis added).  In describing Plaintiff's actual claims of age

discrimination, the complaint begins with the words "[o]n or about January 11, 2009 and through

July 3, 2009," and it then goes on to describe those 2009 acts of discrimination.  Id. at ECF Page

No. 19.  The agency's Report of Investigation in response to Plaintiff's complaint identifies the

dates of alleged discrimination as "January 2009 - July 3, 2009," and describes the "accepted

issue" as "[w]hether the Complainant was discriminated against . . . when beginning in January

2009 . . . he was subjected to continuous harassment . . .."  ECF No. 70 at ECF Page Nos. 4-6.

Again, after considering only the evidence provided by Plaintiff, and after resolving any

reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has failed to produce

sufficient evidence from which a fact-finder could conclude that Defendant waived the exhaustion

requirement.

### 4.       Conclusion

Defendant is entitled to summary judgment against any claims arising out of the "discrete

acts" that occurred in 2006.

### B.       The May 2009 Work Expectations Memorandum

Defendant argues that he is entitled to judgment that the May 2009 Work Expectations

Memorandum cannot constitute an adverse employment action.  At issue is whether that

memorandum merely reiterated the previously imposed Reporting Requirement, or whether it

constituted a new requirement.

The Court first notes that the May 2009 memo contains at least one requirement that had

not previously been imposed upon Plaintiff: the requirement that Plaintiff call Speicht from the

Oakland office at 8:30 a.m.  To the extent that this can be considered an "adverse employment

action," Defendant is not entitled to judgment against it on the grounds that it had been previously

imposed.

As to the rest of the requirements in the May 2009 Memo, Defendant cites several cases

for the principle that reprimanding an employee for not meeting work expectations is not an

adverse employment action.  Phelps v. U.S. Gen. Services Agency, 469 Fed. App'x 548, 550 (9th

United States District Court
Northern District of California

1    Cir. 2012) (unpublished) (memo putting the plaintiff on notice of deficiencies in work

2    performance is not an adverse employment action); <u>Yee v. Solis</u>, No. 08-cv-4259 MMC, 2010 WL

3    1655816, at *5 (N.D. Cal. Apr. 22, 2010) (reprimand in a counseling memo is insufficient to

4    support a Title VII retaliation claim).  As Defendant reads these cases, the reason the reprimands

5    do not qualify as adverse actions is because they only enforce an existing requirement rather than

6    impose a new workplace condition.  The cases are susceptible to such an interpretation, but neither

7    opinion discusses this rationale explicitly.

8         In the third case Defendant cites, <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 271

9    (2001), school district employee Shirley A. Breeden claimed that she was punished by her

10   employee for filing charges against the school district with the Nevada Equal Rights Commission,

11   the EEOC, and in federal court.  Breeden filed her lawsuit on April 1, 1997 and on April 10, 1997

12   the Assistant Superintendent "mentioned [to the] Executive Director of plaintiff's union, that she

13   was contemplating transferring plaintiff to the position of Director of Professional Development

14   Education . . .." <u>Id.</u> at 271-272.  However, Breeden "did not serve petitioner with the summons

15   and complaint until April 11, 1997, one day *after* [the Assistant Superintendent] had made the

16   statement, and [the Assistant Superintendent] filed an affidavit stating that she did not become

17   aware of the lawsuit until after April 11." <u>Id.</u> at 272.  Therefore, the Supreme Court concluded

18   that Breeden had failed to show a causal nexus between the allegedly retaliatory act and the

19   protected activity because the "retaliatory" act was already decided or set in motion before the

20   school district became aware of Breeden's charges.  <u>Id.</u>  Similarly here, Defendant argues that the

21   Reporting Requirement was already decided on or set in motion in 2006, long before any allegedly

22   retaliatory or discriminatory acts were taken by Defendant in 2009.

23        However, "[t]he existence of past acts and the employee's prior knowledge of their

24   occurrence . . . does not bar employees from filing charges about *related discrete acts* so long as

25   the acts are *independently discriminatory* and charges addressing those acts are themselves timely

26   filed." <u>Morgan</u>, 536 U.S. at 113 (emphases added).  If Plaintiff can show that the 2009 Reporting

27   Requirement is an "independent" discrete act, the act of issuing the memo in 2009 would create a

28

1   separate cause of action not barred by the statute of limitations.

2          To be an "independent" act that qualifies as an "adverse employment action," the May

3   2009 Memo would have to do more than remind Plaintiff of previously existing job

4   responsibilities.  In a Title VII retaliation case, "[a]n action is an adverse employment action if a

5   reasonable employee would have found the action materially adverse, which means it might have

6   dissuaded a reasonable worker from making or supporting a charge of discrimination," and in a

7   Title VII discrimination case "[a]n action is an adverse employment action if it materially affects

8   the terms, conditions, or privileges of employment."  Ninth Circuit Civil Jury Instructions,

9   10.4A.1 & 10.4.A.2 (citing Burlington No. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)

10  and Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1126 (9th Cir.2000)).  "The

11  ADEA defines several common terms in the same manner as Title VII," and therefore in an

12  ADEA action "the . . . Title VII instructions[] [at 10.4A.1 and 10.4A.2] . . . should be given."  Id.

13  11.5.

14         But in this case, the May 2009 Memo *did* materially affect Plaintiff's actual employment

15  conditions, since at the time he was, in fact, working out of Stockton.  Of course the Court takes

16  Defendant's point - to the extent that an employee merely declines to perform an understood work

17  requirement, she cannot claim that being told to do her job is an adverse action.  And there is

18  significant evidence that both Plaintiff and Speicht understood that shifting Plaintiff's workplace

19  to Stockton was in violation of Inselmann's demands.  But ASAC Speicht was Plaintiff's

20  immediate supervisor, and both he and Plaintiff understood Speicht to have "allowed" Plaintiff to

21  work from Stockton.  Speight Depo. 131:3-11 (ECF No. 69, at ECF Page No. 148); Offield Depo.

22  130:4-131:19 (ECF No. 69, at ECF Page Nos. 100-01).  Moreover, there is significant evidence in

23  the record that Plaintiff's operation out of Stockton was open and notorious for several years.

24         None of Defendant's cited authority establishes as a matter of law that these facts, if every

25  reasonable inference were resolved in Plaintiff's favor, and none of Defendant's evidence were

26  considered as a counter-weight, are insufficient to support the conclusion that the May 2009

27  Memo imposed a new workplace condition on Plaintiff.  Therefore, Defendant is not entitled to

28

United States District Court
Northern District of California

21

1   summary judgment on this issue.[6]

2   **C.      Sufficiency of Evidence Regarding 2009 Actions**

3         Defendant does not argue that the 2009 Actions are time-barred.  But he does move for

4   judgment on the grounds that there is insufficient evidence that the DEA took those actions as

5   pretext for age discrimination.

6         Summary judgment of ADEA claims continue to be governed by the three-part <u>McDonnell</u>

7   <u>Douglas</u> framework.  <u>See</u> <u>Shelley</u>, 666 F.3d at 608-09; <u>but</u> <u>see</u> <u>also</u> Judge David F. Hamilton, <u>On</u>

8   <u>McDonnell Douglas and Convincing Mosaics</u>, 17 Employee Rts. & Emp. Pol'y J. 195 (2013)

9   (thoughtfully critiquing overreliance on the <u>McDonnell-Douglas</u> framework).

10        "[T]o survive summary judgment," a plaintiff must first "establish a *prima facie* case of

11  age discrimination."  <u>Shelley</u>, 666 F.3d at 608 (9th Cir. 2012) (citing <u>Coleman v. Quaker Oats Co.</u>,

12  232 F.3d 1271, 1280-81 (9th Cir. 2000)).  "If he is successful, the burden of production shifts to

13  the . . . [Defendant] to articulate a legitimate non-discriminatory reason for its adverse

14  employment action."  <u>Shelley</u>, 666 F.3d at 608 (citing <u>Coleman</u>, 232 F.3d at 1281).  If one is

15  articulated, the Plaintiff must then "demonstrate that there is a material genuine issue of fact as to

16  whether the employer's purported reason is pretext for age discrimination."  <u>Shelley</u>, 666 F.3d at

17  608 (citing <u>Coleman</u>, 232 F.3d at 1281).

18        **1.     *Prima Facie* Case**

19        "A '*prima facie* case requires evidence adequate to create an inference that an employment

20  decision was based on a[n] [illegal] discriminatory criterion.'"  <u>Shelley</u>, 666 F.3d at 608 (<u>quoting</u>

21  <u>O'Connor v. Consol. Coin Caterers Corp.</u>, 517 U.S. 308, 312 (1996) (alterations in the original)).

22  _____

23  [6] At trial, when the Court must sit as a finder of fact and weigh both parties' evidence, the Court
    will need to determine how to determine whether an action can constitute an "adverse employment

24  action" when the employee's previous working conditions were permitted by the employee's
    immediate supervisor but which the employee knows were in clear contradiction to requirements

25  imposed by a higher authority at the same employer.  The parties are ordered to brief what legal
    standard the Court should apply in making this determination, with particular care for

26  distinguishing the distinct standards for retaliation claims and discrimination claims.  As a starting
    point, the Court is considering applying the following standard: "Did the action impose a

27  condition upon the employee which he both subjectively and reasonably believed were not part of
    his employee responsibilities at the time the action was taken?"

28

United States District Court
Northern District of California

United States District Court
Northern District of California

In bringing an age discrimination action under the ADEA, plaintiffs must meet four criteria. First and second, employees must establish that they are "members of the protected class (at least age 40)" and were "performing their jobs satisfactorily." Coleman, 232 F.3d at 1281 (9th Cir. 2000). Third and fourth, they must show that they "experienced an adverse employment action" and "similarly situated individuals outside . . . [the] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." Whitman v. Mineta, 541 F.3d 929, 932 (9th Cir. 2008) (citing Peterson v. Hewlett–Packard Co., 358 F.3d 599, 603 (9th Cir. 2004)).

The introduction to Defendant's motion suggests that Defendant seeks summary judgment specifically on the grounds that Plaintiff has failed to demonstrate a *prima facie* case, as distinct from Defendant's argument that Plaintiff has failed to produce sufficient evidence from which a fact-finder could find that the employment action was pretextual. Motion 2:6-11. But the text of the motion itself rests almost entirely on the final prong of the McDonnell-Douglas framework: whether there is a triable issue of fact regarding pretext. See Motion 16:16-17:8, 18:9-21:2; see also id. 20:28-21:2 ("Even if plaintiff could establish a *prima facie* case of retaliation, as discussed above, DEA had legitimate, non-discriminatory reasons for the transfer, and plaintiff cannot demonstrate that these reasons were pretextual"); see also Reply Brief 5:18-28.

There is significant overlap between the fourth prong of the *prima facie* inquiry (whether there are sufficient circumstances giving rise to an inference of discrimination), and the later "pretext" inquiry. See Hamilton, 17 Emp. Rts. & Emp. Pol'y J. at 201-02 ("[t]he two steps of the McDonnell Douglas test, properly understood, are not hermetically sealed off from one or another, though they are sometimes misunderstood that way"). Perhaps Defendant believes these two issues rise and fall together. In any case, it is undisputed that Plaintiff is more than 40 years old, and Defendant has not moved for judgment on the grounds that no reasonable finder of fact could determine that Plaintiff was performing his job satisfactorily, or that the challenged employment actions were adverse employment actions.[7] If there are requirements of the *prima*

---

[7] Defendant does dispute whether the challenged actions were sufficient to constitute "constructive

23

*facie* inquiry that are distinct from the "pretext" inquiry, Defendant has not sought judgment on those grounds alone.

### 2.      Legitimate Non-Discriminatory Reasons

Defendant has articulated legitimate non-discriminatory reasons for taking the challenged employment actions.  For example, all SA/Ps are expected to report to their field offices when not engaged in OA activities, and Brown has declared that the DEA imposed the Reporting Requirement because Brown had received complaints that agents did not see Plaintiff in the office, and therefore they did not know what he did with his time and whether they could rely on him. Exh A to Inselmann Decl.; Brown Decl. ¶¶ 4, 7.  Defendant also maintains that the DEA requires SA/Ps to perform TDY assignments in both domestic and foreign locations, based upon the needs of the DEA's global mission.  Harrigan Decl. ¶ 7; Brown Decl. ¶11.  Defendant also justifies the DEA's eventual decision to transfer Plaintiff out of the Air Wing since Plaintiff declined to perform his assigned TDY.  Harrigan Decl. ¶ 9.

In his papers, Plaintiff does not clearly contest whether Defendant's proffered reasons are facially legitimate, as opposed to contesting whether they were mere pretext for age discrimination.  The closest Plaintiff comes to contesting the facial legitimacy of the requirements is in arguing that under federal law, "federal agencies may not make postings to Afghanistan mandatory."  Opp. 19:15-16.  Plaintiff bases this on his interpretation of 41 U.S.C. § 2312, which requires the Administrator of General Services to create a Contingency Contracting Corps. "Membership in the Corps shall be voluntary and open to all Federal employees and members of the Armed Forces who are members of the Federal acquisition workforce."  41 U.S.C. § 2312(e).

The statute states that "[t]he authorities provided in this section apply with respect to any procurement of property or services by or for an executive agency that, as determined by the head of the executive agency, are to be used . . . in support of a contingency operation," such as the military conflict in Afghanistan.  41 U.S.C. § 2312(d).  As Plaintiff reads the statute, by requiring Plaintiff to perform TDY in Afghanistan, the DEA effectively made him a member of the

discharge," as discussed more fully *infra*.

United States District Court
Northern District of California

Contingency Contracting Corps, and such membership can only be voluntary.  Plaintiff cites no authority for this interpretation.  Numerous federal employees are required to serve in areas of military conflict as part of their job responsibilities, and it is highly implausible that Congress intended in enacting this statute to prohibit this practice.

Defendant has proffered facially legitimate non-discriminatory reasons for the challenged actions.

### 3.    Genuine Issue of Material Fact Regarding Pretext

Defendant argues that Plaintiff has failed to present sufficient evidence to create a triable issue from which a reasonable fact-finder could conclude that the challenged actions were actually pretext for age discrimination.  The following considerations weigh against such a finding:

1.  The suspiciously onerous nature of the Reporting Directive, since at the time it was issued Offield was flying the helicopter out of Stockton, from a hangar in which the DEA had invested significant money.  Opp. 12:5-13:11, and record citations therein.

2.  That Inselmann and other DEA officials provided different justifications for the Reporting Directive at different times.  Id. 13:10-14:25, and record citations therein. See Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1993) ("[I]n the ordinary case, . . . fundamentally different justifications for an employer's action would give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason.")

3.  Offield's testimony that Plaintiff told him "I'm not going to allow you senior guys to retire in place."

4.  The testimony of another S/AP, Terrence Michael Epp, that Inselmann told Epp and a group of other pilots in 2006 that "I can't wait until I turned [sic] 50 . . . because when I turn 50, I can do anything I want to anybody and if they turn up the heat, I can just retire."  Epp Depo. 20:18-22:9 (ECF No. 41, at ECF Page Nos. 39-41).  Epp also believed Inselmann had intentionally made Epp's work unpleasant enough to force him to quit, including by ordering him to deploy to Haiti in a conversation that seemed

1    retaliatory and vindictive.  Id. 39-40, 63-67, 164-65.[8]

2        5.   S/AP Matthew Hackett's affidavit testimony that, after he refused to go TDY to

3            Afghanistan, he was ultimately allowed to remain in the Air Wing regardless,[9] and that

4            in his opinion the DEA was "using Afghanistan as a way to either force people out that

5            they may not like or to punish people that they just don't like."  ECF No. 70, at ECF

6            Page Nos. 71-75, 81-82.

7        Some of this evidence relates to the 2006 Reporting Requirement rather than the 2009

8    Actions.  However, even though untimely claims are barred, this does not "bar an employee from

9    using the prior acts as background evidence in support of a timely claim."  Morgan, 536 U.S. at

10   113.  In articulating this standard, Morgan analyzed one the Supreme Court's earlier cases, United

11   Air Lines, Inc. v. Evans, 431 U.S. 553 (1977).  Morgan, 536 U.S. at 112.  In United, the defendant

12   forced the plaintiff

13           to resign after she married because of its policy against married
14           female flight attendants. Although [the plaintiff] failed to file a
             timely charge following her initial separation, she nonetheless
15           claimed that United was guilty of a present, continuing violation of
             Title VII because its seniority system failed to give her credit for her
16           prior service once she was rehired. The [Supreme] Court i[n United]
             disagreed, concluding that "United was entitled to treat [the
17           plaintiffs' resignation] as lawful after [she] failed to file a charge of
             discrimination within the charge filing period then allowed by the
18           statute." At the same time, however, the Court noted that "[i]t may
             constitute relevant background evidence in a proceeding in which
19           the status of a current practice is at issue." The emphasis, however,
             "should not be placed on mere continuity" but on "whether any
20           present violation exist[ed]."

21   Morgan at 112-113. (emphasis in original).  Therefore, although the 2006 Acts cannot constitute

22   "discrete acts" forming the basis of Plaintiff's claims, they may be used as evidence tending to

23   _____

     [8] Plaintiff states that Epp believed he was the victim of age discrimination.  But in the only
24   colloquy Plaintiff points to as evidencing that fact, Plaintiff's counsel's question was compound
     and vague, and it is unclear whether Epp affirmatively indicated that age discrimination was the
25   reason for his workplace conditions.  Epp. Depo. 164:13-165:20 (ECF No. 69, at ECF Page Nos.
     52-53).
26   [9] ASAC Brown declares that Hackett ultimately agreed to deploy to Afghanistan.  Brown Decl. ¶
27   13.  Hackett's affidavit is ambiguous as to whether he explicitly agreed to do so when deciding to
     remain with the Air Wing, and Hackett was deployed to Bolivia, not Afghanistan.  ECF No. 70, at
28   ECF Page Nos. 76-80.

1    show that age discrimination was the true motivation for the 2009 Acts.

2        A determination whether the 2009 Actions were in fact motivated by discriminatory

3    animus must await trial, with its determinations of credibility and resolution of competing

4    inferences.  For now, however, it is sufficient to conclude that, taken as a whole and with all

5    reasonable inferences resolved in Plaintiff's favor, Plaintiff's evidence is sufficient for a finder of

6    fact to conclude that the 2009 Actions were taken as pretext for age discrimination or retaliation.

7        **D.    Constructive Discharge**

8        Defendant moves for summary judgment that the 2009 Acts cannot constitute

9    "constructive discharge."

10        "Constructive discharge occurs when, 'looking at the totality of the circumstances, a

11    reasonable person in [the employee's] position would have felt that he was forced to quit because

12    of intolerable and discriminatory working conditions.'"  Wallace v. City of San Diego, 479 F.3d

13    616, 625 (9th Cir. 2007) (quoting Watson v. Nationwide Ins. Co., 823 F.2d 360, 361 (9th Cir.

14    1987)  "For a constructive discharge claim, "[t]he inquiry is objective: Did working conditions

15    become so intolerable that a reasonable person in the employee's position would have felt

16    compelled to resign?"  Poland v. Chertoff, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting Penn.

17    State Police v. Suders, 542 U.S. 129, 141 (2004)).  The Ninth Circuit has described this standard

18    as setting a high bar.  Poland, 494 F.3d at 1184.

19        "[C]onstructive discharge occurs when the working conditions deteriorate, as a result of

20    discrimination, to the point that they become sufficiently extraordinary and egregious to overcome

21    the normal motivation of a competent, diligent, and reasonable employee to remain on the job to

22    earn a livelihood and to serve his or her employer."  Id. (quoting Brooks v. City of San Mateo, 229

23    F.3d 917, 930 (9th Cir. 2000)).  "The determination whether conditions were so intolerable and

24    discriminatory as to justify a reasonable employee's decision to resign is normally a factual

25    question left to the trier of fact."  Watson, 823 F.2d at 361.

26        As a net result of the 2009 Acts, Plaintiff was compelled to commute to an office

27    approximately 75 miles from his home, to work at a desk job at his same base salary rather than

28

United States District Court
Northern District of California

continue working as a pilot, and was denied the opportunity to earn extra income for hazardous duty pay from flying.  Applying <u>Poland</u>, these consequences are insufficient as a matter of law to constitute constructive discharge.

In <u>Poland</u>, the employer reassigned a Customs Service agent from Portland, Oregon to Vienna, Virginia, separating him from his family, and demoted him from a supervisory position to a nonsupervisory position.  Reversing the district court, the Ninth Circuit held that "is insufficient, as a matter of law, to establish a constructive discharge."  494 F.3d at 1184.  This was particularly because, as in this case, Customs agents "sign waivers acknowledging that they may be transferred anywhere in the country for the good of the agency."  <u>Id.</u> at 1185; <u>see</u> Leonhart Decl. ¶ 22.  The authorities Plaintiff cites in opposing summary judgment are notably distinguishable.  <u>See</u>, <u>e.g.</u>, <u>Wallace</u>, 479 F.3d at 626 (summary judgment inappropriate where plaintiff offered evidence of a nine-year pattern of discrimination, including several unjustified and excessive disciplinary proceedings, the initiation of termination proceedings, and the imposition of suspensions).

After considering Plaintiff's evidence and resolving all reasonable inferences in Plaintiff's favor, the Court finds that Defendant is entitled to judgment as a matter of law against Plaintiff's constructive discharge claim.

### E.   2010 OPR Investigation

Plaintiff's complaint mentions that he filed a 2009 complaint with the DEA's Office of Special Counsel regarding waste and fraud at the DEA, and that he was interviewed by investigators from the DEA's Office of Professional Responsibility ("OPR") in January 2010. Complaint ¶¶ 72, 74.  Plaintiff has testified that the investigators "started to question me about previous things that had occurred in the AirWing that weren't relative to, in my opinion, to the allegations that I had made," and he believes that they did so because of his age.  Pl. Depo. 337:2-18 (ECF No. 60-1, at ECF Page No. 108).

Defendant argues that "[s]ummary judgment is warranted on plaintiff's claims regarding the OPR interview."  MSJ 24:4.  Plaintiff does not respond to this aspect of Defendant's motion in his opposition brief.

To the extent that January 2010 actions taken by OPR investigators form part of Plaintiff's claims, Defendant is entitled to judgment.  Plaintiff did not meet the presuit exhaustion requirements with regard to these actions, since he filed his EEO complaint before the interview took place.  The Court lacks jurisdiction over this claim.

### F.      Denial of Sacramento Promotion

The Complaint suggests that Plaintiff may not have been selected for a supervisory promotion at the Sacramento District Office because of his age.  Complaint ¶ 76.  Defendant moves for judgment on the grounds that, *inter alia*, Plaintiff "failed to comply with the ADEA's prefiling requirements related to this claim, and thus, summary judgment should be granted in defendant's favor."  MSJ 25:6-8.  Again, Plaintiff does not respond to this in his opposition brief.

As above, to the extent that the DEA's failure to promote Plaintiff forms part of Plaintiff's claims, Defendant is entitled to judgment.  Plaintiff did not meet the presuit exhaustion requirements with regard to this action, since he filed his EEO complaint before he applied for the promotion.

### G.      Available Damages

Defendant moves for "summary judgment in favor of defendant on plaintiff's claims for general, compensatory, liquidated, and punitive damages."  MSJ 25:23-24.

The Ninth Circuit has held that "[c]ompensatory damages for pain and suffering and punitive damages are not available under the ADEA."  <u>Ahlmeyer v. Nevada Sys. of Higher Educ.</u>, 555 F.3d 1051, 1059 (9th Cir. 2009).  Plaintiff reads this holding as limited to the ADEA provisions regulating actions against private employers.  Plaintiff argues that other types of damages should be recognized in ADEA actions against federal employers, because they are a type of "legal . . . relief as will effectuate the purposes of this chapter," namely the purpose of ensuring that federal agencies' decisions are made "free from any discrimination made by age." 29 U.S.C. §§ 633a(a), 633(c).  But he cites no authority as ever having accepted this proposition.

Even assuming <u>Ahlmeyer</u>'s holding is limited to actions against private employers, other circuit and district courts have extended the rule to apply specifically to actions against the federal

government.  See Miller v. Kerry, 924 F. Supp. 2d 133, 138-41 (D.D.C. 2013) (collecting cases, including from the Fifth and Tenth Circuits, and "agree[ing] with the conclusion of every other court to have addressed this issue: Congress has not waived federal sovereign immunity with respect to compensatory damages under the ADEA").

The Court is persuaded by this rationale, since waivers of sovereign immunity cannot be implied, and it seems unlikely that Congress implicitly waived the federal government's immunity to accept greater liability than it permitted against private employers.   Moreover, "Congress amended Title VII in 1991 to allow for compensatory damages, it could have decided to do the same for the ADEA, but it did not."  Miller, 924 F.Supp.2d at 140.  "When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."  Gross v. FBL Financial Services, 557 U.S. 167, 174 (2009).  A similar rationale applies to liquidated and punitive damages.  See Walker v. U.S. Dep't of Commerce, No. 1:11-CV-01195 AWI, 2012 WL 1424495, at *6 (E.D. Cal. Apr. 24, 2012) (citing Chambers v. Weinberger, 591 F.Supp. 1554, 1557 (D.Ga. 1984)) (liquidated damages not available in ADEA action against federal government).

Defendant is entitled to judgment against Plaintiff's non-wage, general, liquidated, and punitive damages claims.

### H.      Hostile Work Environment

In his opposition, Plaintiff argues that the "government's motion makes no contention that plaintiff's claims of a hostile work environment are free of genuine dispute," and that therefore that claim should proceed to trial.  Opp. 21:10-11.  But the operative complaint does not bring a hostile work environment claim.

The complaint's caption list three causes of action: age discrimination under the ADEA, retaliation under the ADEA, and retaliation under the False Claims Act.  Complaint, ECF Page No. 1.  Later, in describing his "claims for relief," Plaintiff lists two: the first for age discrimination under the ADEA, and the second for retaliation under the False Claims Act. Complaint ¶¶ 85-92.

United States District Court
Northern District of California

There is only one reference to "hostile work environment" in the complaint, and in it Plaintiff is describing the allegations he made in his EEOC complaint, not the allegations he is bringing in this lawsuit.  ¶ 11.  In addition to claiming age discrimination, Plaintiff brought several other allegations in his EEOC complaint that do not form the basis of this lawsuit.

The only other use of the word "hostile" is at ¶ 91, where Plaintiff alleges that "Plaintiff's supervisors treated Plaintiff hostilely for his refusal to participate in or allow violations of state and federal law, instructed him to keep quiet, and ultimately retaliated against in Plaintiff."  Even to the extent that this statement could be read to put Defendant on notice of a hostile work environment claim, this paragraph is in the portion of the Complaint describing Plaintiff's claims under the False Claims Act that he was retaliated against for making his 2009 complaint to the OPR.  The Court previously dismissed this claim by Plaintiff's stipulation.  ECF No. 21.

There is no hostile work environment claim in the operative complaint, and therefore such a claim cannot proceed to trial.

### I.    Standard of Persuasion for Causation

The parties disagree about whether the burden of persuasion in proving discrimination is "but-for" causation in cases against the federal government.  MSJ 12:12-18; Opp.1:20-2:9; Reply Br. 1:10-24.  Although the Court did not need to resolve this dispute to decide the present motion, the Court finds that the standard of proof is "but-for" causation.  In Shelley, a case against a federal government employer, the Ninth Circuit held that "[a]t trial, . . . [the employee] must carry the burden to prove that age was the 'but-for' cause of his non-selection."  666 F.3d at 608 (citing Coleman, 232 F.3d at 1280-81).

## III.   CONCLUSION

Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART consistent with the foregoing.  Defendant is entitled to judgment in its favor as to:

1.    Claims arising out of the 2006 Actions.

2.    Plaintiff's claim of constructive discharge.

3.    Any claims arising out of the 2010 OPR investigation or Plaintiff's non-selection

United States District Court
Northern District of California

1        for a promotion in 2010.

2        4.     Plaintiff's claims for non-wage compensatory, general, liquidated and punitive

3        damages.

4        5.     Plaintiff's hostile work environment claim.

5  The motion is DENIED insofar as it seeks any other relief.

6        **IT IS SO ORDERED.**

7  Dated:  May 12, 2014



                             JON S. TIGAR
                        United States District Judge

United States District Court
Northern District of California